## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| R.C. OLMSTEAD, INC. | ) | CASE NO. 5:08CV0234 |
| | ) | |
| Plaintiff | ) | JUDGE: LIOI |
| | ) | |
| v. | ) | **DEFENDANTS' JOINT MOTION FOR** |
| | ) | **SUMMARY JUDGMENT ON ALL** |
| | ) | **REMAINING CLAIMS** |
| CU INTERFACE, LLC, et al | ) | |
| | ) | |
| Defendants | ) | |

Now come Defendants CU Interface, LLC, Software Properties, LLC and Thomas Burkhardt ("collectively CUI"), and Defendant Canton School Employees Credit Union ("CSE"), and pursuant to Fed. R. Civ. P. 56(b) move for summary judgment on all claims filed against them by Plaintiff R.C. Olmstead, Inc. ("RCO"). No genuine issue of material fact exists on essential elements of each of RCO's claims, upon which summary judgment briefing has not yet closed. See ECF 71, 92, 83, 86, 87, 94 and 96. Defendants are entitled to judgment as a matter of law. A Memorandum in Support is attached and incorporated herein.

Respectfully submitted,

/s/ Andrew Mills Holford
Andrew Mills Holford (#0074091)
1650 Lake Shore Drive, Suite 180
Columbus, Ohio 43204-4894
Tel: 614–228-7710
Fax: 866-460-2901
AndrewHolford2008@gmail.com
Attorney for CU Interface, LLC,
Software Properties, LLC
and Thomas Burkhardt

/s/ Stephen M. Nowak
George Carr (#0069372)
Stephen M. Nowak (#0078349)
GALLAGHER SHARP
Sixth Floor, Bulkley Building
1501 Euclid Avenue
Cleveland, Ohio 44115
Tel:  216-241-5310
Fax:  216-241-1608
gcarr@gallaghersharp.com
snowak@gallaghersharp.com
Attorneys for Defendant Canton School
Employees Credit Union

## CERTIFICATE OF SERVICE

A copy of the foregoing was filed electronically on this 22nd day of December, 2008.

Notice of this filing will be sent to all parties by operation of the Court's ECF system.  Parties

may access this filing through the Court's electronic filing system.

/s/ Stephen M. Nowak
George Carr (#0069372)
Stephen M. Nowak (#0078349)
GALLAGHER SHARP

## LOC.R. 7.1(f) CERTIFICATION

Defendants CU Interface, LLC, Software Properties, LLC and Thomas Burkhardt and

Defendant Canton School Employees Credit Union certify, pursuant to Loc.R. 7.1(f) of this

Court that this case has been assigned to the Standard track by this Court's Case Management

Conference Order of April 18, 2008 (ECF No. 16) and that it complies with the 20-page

limitation set forth in Loc.R. 7.1(f).

/s/ Stephen M. Nowak
George Carr (#0069372)
Stephen M. Nowak (#0078349)
GALLAGHER SHARP

# TABLE OF CONTENTS

Page

I.      UNCONTESTED FACTS ...................................................................................1

II.     STANDARD OF REVIEW ...............................................................................2

III.    ARGUMENT ....................................................................................................3

        A       PLAINTIFF RCO HAS NO EVIDENCE OF COPYRIGHT
                INFRINGEMENT ..................................................................................3
                (1)     Literal Elements and Non-Literal Elements of
                        Computer Programs ....................................................................5
                (2)     Literal Copying versus Non-Literal Copying ...........................6
                (3)     RCO's Alleged Literal Elements at Issue ..................................6
                (4)     RCO's Alleged Non-Literal Elements at Issue ..........................7

        B       PLAINTIFF'S TARDE SECRET CLAIMS LACK MERIT ...........................8
                (1)     Plaintiff cannot establish it has a protectable trade
                        secret ........................................................................................8
                (2)     Plaintiff has no evidence of improper means ...........................11

        C       RCO AUTHORIZED THE ACTIONS THAT FORM THE
                BASIS FOR ITS DMCA CLAIM .........................................................13
                (1)     RCO gave CSE its express permission to hire a third-
                        party computer support company .............................................15
                (2)     RCO permitted CSE employees to abort the RCO-1
                        program ...................................................................................16

        D       DEFENDANTS' ACTS WERE JUSTIFIED AND NO
                BREACH OCCURRED ......................................................................17

        E       CSE HAD A CONTRACT AND CUI RECEIVED NO
                BENEFIT ..........................................................................................20

III.    CONCLUSION ...........................................................................................20

## TABLE OF AUTHORITIES

**Cases** Page

1. *Auto Inspection Services, Inc. v. Flint Auto Auction, Inc.,*
   2006 WL 3500868 (E.D. Mich. 2006) ................................................................. 4, 5

2. *Computer Assocs. Intl., Inc. v. Altai, Inc.,* 982 F.2d 693 (2d Cir. 1992) ...........................4, 5

3. *CoxCom, Inc. v. Chaffee,* 536 F.3d 101 (1st Cir. 2008) ....................................................14

4. *Crown Equipment Corp. v. Toyota Material Handling U.S.A., Inc.,*
   2005 U.S. Dist. LEXIS 25741 (N.D. Ohio 2005)................................................................19

5. *Diamond Wine & Spirits v. Dayton Heidleberg Distributing Co., Inc.,*
   148 Ohio App.3d 596 (2002) ......................................................................................18

6. *Feist Pub'lns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991) ...............................3

7. *Fred Siegel Co., L.P.A. v. Arter & Hadden,* 85 Ohio St.3d 171 (Ohio 1999) .......................19

8. *Geo-Pro Serv. Inc. v. Solar Testing Laboratories, Inc.,*
   145 Ohio App.3d 514 (2001) ......................................................................................18

9. *Glasstech, Inc. v. TGL Tempering Systems, Inc.,*
   50 F. Supp. 2d 722 (N.D. Ohio 1999) ...........................................................................13

10. *Hildreth Mfg. v. Semco, Inc.,* 151 Ohio App. 3d 693, 709 (2003) .....................................10

11. *Ilog, Inc. v. Ilog, S.A.,* 181 F.Supp. 2d 3 (D. Mass. 2002) ........................................4, 6

12. *I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.,*
    307 F. Supp. 2d 521 (S.D.N.Y. 2004) .....................................................................15, 17

13. *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St. 3d 415 (1995) ...............................17

14. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470 (1974) ...................................................9

15. *Kohus v. Mariol,* 328 F.3d 848 (6th Cir. 2003) ........................................................4, 7

16. *Lexmark Intl., Inc. v. Static Control Comp. Inc.* 387 F.3d 522 (6th Cir. 2004) .................4, 13

17. *Mitek Holdings, Inc. v. Arce Eng'g Co.,* 89 F.3d 1548 (11th Cir. 1996) .....................4, 5, 8

18. *Northeast Ohio College of Massotherapy v. Burek,*
    144 Ohio App.3d 196 (7th Dist. 2001) ......................................................................19

19. *O.P. Solutions, Inc. v. Intellectual Property Network, Ltd.,*
    1999 U.S. Dist. LEXIS 979 (S.D.N.Y. 1999) .................................................................4

4

20. *Penetone Corp.v. Palchem Inc.*, 627 F. Supp. 997 (N.D. Ohio 1985) ………………………….....8

21. *Power Mktg. Direct, Inc. v. B. Ball,*
    2004 U.S. Dist. LEXIS 29068 (S.D. Ohio 2004) …………………………………………....9, 10

22. *Softel Inc. v. Dragon Medical and Scientific Comm., Inc.,*
    118 F.3d 955 (2d Cir. 1997) ……………………………………………………………………….4

23. *The Extracorporeal Alliance, L.L.C. v. Rosteck,*
    285 F. Supp. 2d 1028 (N.D. Ohio 2003) (Wells, J.) …………………………………………..19

24. *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.,*
    24 Ohio St. 3d 41 (1986) ……………………………………………………………………....9

## Other Authorities

25. Ohio's Trade Secret Act, R.C. 1333.61 et seq. …..………………………………………...9, 11

26. 17 U.S.C. § 1201 et seq. …...…………………………………………………………….14

## STATEMENT OF ISSUES TO BE DECIDED

Whether Defendants CU Interface, LLC, Software Properties, LLC and Thomas Burkhardt and Defendant Canton School Employees Credit Union ("Moving Defendants") are entitled to summary judgment on Plaintiff R.C. Olmstead, Inc.'s claims for: (1) copyright infringement, (2) misappropriation of trade secrets, (3) violations of the Digital Millenium Copyright Act, (4) tortious interference with contractual and business relations, and (5) unjust enrichment.

## SUMMARY OF ARGUMENT PRESENTED

The Moving Defendants are entitled to summary judgment on Plaintiff R.C. Olmstead, Inc.'s claim for:

- Copyright infringement because Plaintiff cannot produce any evidence showing that any protectable elements of its computer program were copied;

- Misappropriation of trade secrets because Plaintiff cannot produce any evidence showing it had a trade secret because it failed to take any reasonable efforts to maintain secrecy;

- Violations of the Digital Millenium Copyright Act ("DMCA") because Plaintiff either expressly authorized Defendant Canton School Employees Credit Union ("CSE") to take the allegations that form the basis for its claim or because the alleged activities do not violate the DMCA;

- Tortious interference with contractual and business relations because Plaintiff cannot show that it had any expectation of future business and/or that the Moving Defendants acted wrongfully; and

- Unjust enrichment because there is an express written contract between Plaintiff and CSE and because Plaintiff did not confer any benefit on the Moving Defendants.

## MEMORANDUM IN SUPPORT

## I.   UNCONTESTED FACTS

CU Interface, LLC, Software Properties, LLC and Thomas Burkhardt (collectively,

"CUI") develop, market, and sell credit union data processing software ("CUDP").  (See Akin

and Burkhardt Affidavits at 2, ¶¶ 1, 2, 7, 8, and 9) (attached and incorporated respectively as

Exhibits A and B).  CUI provides data processing software and services to Defendant Canton

School Employees Federal Credit Union ("CSE").  (See Exs. A and B at 2, ¶¶ 7, 8, and 9).

Before developing CUDP, CUI developed, marketed, and sold a terminal emulation program that

enabled older "dumb-terminal" applications such as R.C. Olmstead's ("RCO") program RCO-1

to run on a modern personal computer using Microsoft Windows.  (See Exs. A and B at 1-2, ¶¶

5-6).  ███████████████████████████████████████████████████████

██████████████████████████████████████   ███████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████   At all relevant times, the use of independent

computer support personnel as well as the terminal emulation program were encouraged by RCO

in their standard data processing contracts.  (See Ex. A to Amended Complaint, p.3 – Support

Boundaries, section A, ECF 77).  █████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

(See generally Ex. C, Software Development Agreement, CSE 00018-00031).  In 2003, CUI and

CSE entered into a development contract to develop a new data processing program that CSE

hoped would replace RCO-1.  Id.  ███████████████████████████████████

████████████████████████████████████████████████████ (See Ex.

C at CSE 00021-00022, Art. V, §§ 5.3, 5.4, 5.6, and 5.7). In 2005, CUI released and CSE ran a

fully functional data processing software program CUDP. (See Exs. A and B, p.2, ¶ 8). For the

purposes of this lawsuit, that program has been designated "Circa 2005 CUDP" aka CUDP as the

closest original version to the one that ran in October of 2005 at CSE.

CUDP assists credit unions in the day to day operations of their business and acts as the

central program used to access and manage credit union member accounts and loans. (See id. at

2, ¶ 11). ████████████████ CUDP is a native "Windows" program that may be run on a

modern Personal Computer without terminal emulation. (See id. at 2, ¶ 12; ████████████

████████████████████ Among many other differences, CUDP has a graphical user

interface, and handles member photos and signature verification online without any additional

programs or assistance. (See Exs. A and B at 3, ¶ 13). CUDP is marketed and sold to the credit

union industry. (See id. at 2, ¶ 9). CUDP's method of operation, reporting, and accounting are

based, in large part, on generally accepted accounting principles and federal regulations. (See id.

at 3, ¶ 14). All of these sources are available from the public domain. Further, credit unions'

various third-party service providers mandate CUDP's compliance with their business practices

and regulatory requirements; these terms are presented to software developers like CUI in a non-

negotiable standardized system, and CUDP incorporates these mandates as well. (See id. At 3,

¶¶ 15-16). CUI has never contracted with, been employed by, or affiliated itself with RCO. (See

id. at 1, ¶ 4). Therefore, no duty of confidence, loyalty, or relation of a special nature ever

existed between CUI and RCO.

CUI has not stolen or copied anything from RCO or RCO-1. (See id., p.3, ¶ 17). CUI

has not misrepresented anything to anyone regarding RCO, RCO-1, or RCO's alleged

2

copyrights, trade secrets, contracts, or business relationships. (See id. at p.3, ¶ 18). CUI has never paid anyone nor asked anyone to obtain proprietary information about RCO, RCO-1 or RCO's alleged copyrights, trade secrets, contracts, or business relationships. (See id. at 3, ¶¶ 19-20). CUI has never encouraged, in any way, anyone contracted with, employed by, or affiliated with RCO to violate a duty of confidence, loyalty, or relation of a special nature to RCO. (See id. at 4, ¶ 21).

CUI has never wrongfully gained proprietary information about RCO's hardware, software, property, or other proprietary information. (See id. at 4, ¶¶ 22-23). CUI has never acquired or incorporated any of RCO's allegedly protected source code, object code, proprietary software elements, or hardware by physical, virtual, electronic or other means in developing CUDP. (See id. at 4, ¶¶ 24-25). CUI has never earned, gained, or retained any benefit whatsoever from RCO, RCO-1, or RCO's alleged copyrights, trade secrets, contracts, or business relationships. (See id. at 4, ¶ 26). No genuine issue of material fact exists that would permit a jury trial on any of plaintiff's spurious and bad faith claims.

## II.     STANDARD OF REVIEW

To comply with the page limitation requirements, undersigned counsel have omitted the usual authorities setting forth the legal framework for a motion for summary judgment. Should the Court desire it, undersigned counsel would promptly submit any necessary supplementation.

## III.    ARGUMENT

### A.   PLAINTIFF RCO HAS NO EVIDENCE OF COPYRIGHT INFRINGEMENT

A plaintiff may establish a claim of copyright infringement by showing (1) ownership of a valid copyright in the computer program at issue and (2) that the defendant copied protectable elements of the work. See *Feist Pub'lns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 113

L.Ed. 2d 358, 111 S.Ct. 1282 (1991); *Lexmark Intl., Inc. v. Static Control Comp. Inc.* 387 F.3d 522 (6th Cir. 2004); *Kohus v. Mariol* , 328 F.3d 848, 853 (6th Cir. 2003).  The second prong tests whether any copying occurred (a factual matter) and whether the portions of the work copied were entitled to copyright protection (a legal matter).  See *Lexmark* at 534 (citations omitted).  In the absence of direct evidence of copying, a claimant may establish the element of copying by showing (1) access to the copyrighted work and (2) that the copyrighted work and the allegedly copied work are substantially similar.  *Kohus*, 328 F.3d 853-854.

In *Kohus*, the Sixth Circuit defined the legal test to determine substantial similarity.  See *id.* at 854-856.  In doing so, they relied on the "abstraction, filtration, comparison" approach originally conceived by Professor Nimmer and first applied by the Second Circuit in *Computer Assocs. Intl., Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992).  See *id.* at 854, n.1.  The first two steps from *Altai* were combined into one.  See *Kohus* at 854-855; *Auto Inspection Services, Inc. v. Flint Auto Auction, Inc.*, 2006 WL 3500868 (E.D. Mich. 2006).

In *Ilog, Inc. v. Ilog, S.A.*, 181 F.Supp. 2d 3 (D. Mass. 2002), the court surveyed the state of software copyright infringement claims and applicable principles post-*Altai*.  The *Ilog* court took care to define whether the claims at issue involve literal or non-literal elements of a computer program as well as whether the alleged copying is of a literal or non-literal nature.  See *id.*  By closely reviewing the parties' submissions and detailed claims, a court can evaluate the strength of the claims under an abstraction-filtration-comparison analysis.  See Court's Minutes of Proceedings dated April 17, 2008; ECF 13 at 3; see *Kohus* at 855-856 (leaving the issue to the parties to develop a scheme of abstractions for the court).  See also *Mitek Holdings, Inc. v. Arce Eng'g Co.*, 89 F.3d 1548, 1555 (11th Cir. 1996); *Softel Inc. v. Dragon Medical and Scientific Comm., Inc.*, 118 F.3d 955, 969 n.9 (2d Cir. 1997); *O.P. Solutions, Inc. v. Intellectual Property*

*Network, Ltd.*, 1999 U.S. Dist. LEXIS 979 (S.D.N.Y. 1999). Therefore, RCO should take great care in crafting its claims of protectable elements and method of copying for defendants and Court; otherwise, no meaningful abstraction can take place. However, Plaintiff appears to reject this approach.

### (1) Literal Elements and Non-Literal Elements of Computer Programs

The literal elements of a computer program involve source and object code. *Altai*, 982 F.2d at 702. "Source code is the series of commands in a specific programming language that direct a computer to perform specific tasks (what is generally thought of as the program), object code is the binary language conversion of source code (the machine readable code)." *Id.* at 698. Non-literal elements of a software program include its structure and fundamental essence, *Id.* at 701, described as the "structure, sequence, and organization" of the underlying program, such as "general flow charts, inter-modular relations, parameter lists and macros." *Id.* at 702. Other aspects of non-literal elements include "code interaction with the computer hardware and operating programs" like screen displays or main menu and submenu command tree structures. See *Mitek* at 1555, n.15. ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████

Unsurprisingly, the relative complexities of analyzing computer software copyright infringement cases demand "rigorous analysis." See *Auto Inspection Services* at 6. Surely, Plaintiff RCO has failed to produce any rigorous analysis of the protectable elements of its program, and has not even attempted to produce such an analysis.

### (2) Literal Copying versus Non-Literal Copying

Just as important as the elements RCO alleges are protectable, is the type of copying alleged. For example, "literal" copying is the verbatim copying of original expression while "non-literal copying is that which is paraphrased or loosely paraphrased". *Ilog* at 7-8 (citations omitted). Recently, RCO explained to the court that it does not allege literal copying of its source code. (See RCO Reply to CSE Opposition to SJ at 9, ECF 94). This makes sense, because RCO concedes that its program and CUDP are written in different source-code languages. As was discussed at the Case Management Conference, literal copying in such cases is quite impossible, akin to allegations that a French poem was "copied" into Arabic. Rather, RCO allege "that defendants unlawfully accessed, reviewed, copied, and modified RCO'S source code and then utilized this information in creating their own product." *Id.* Plaintiff RCO has never specified whether the copying at issue is literal or non-literal. (See Plaintiff RCO's Notice and Description of Copyright Claim, ECF 44, ECF 48 at Ex. D). As no literal copying is alleged, it appears that only non-literal copying is being alleged.

### (3) RCO's Alleged Literal Elements at Issue

RCO alleged in its Notice of Copyright Claim that their source code is generally at issue. (See Plaintiff RCO's Notice and Description of Copyright Claim, ECF 44, ECF 48 at Ex. D at 4). Their Notice and Description of Copyright Claim alleges only that Defendants had access to some protectable elements in the RCO-1 source code but nowhere has RCO identified what portions, if any, of their source code were copied, or whether those portions were protected by copyright or not. (See id.). This court already has acknowledged the confusion surrounding the versions of RCO-1's source code provided in this case. (See ECF 75 at 6). In fact, Plaintiff RCO concedes it has not obtained any opinion, expert or otherwise, to review the source code of

6

RCO-1 and create a table of protectable elements, or determine whether those elements exist in Circa 2005 CUDP. (See RCO's Reply Memorandum in Support of Summary Judgment, p.9., ECF 94). Further, RCO cannot and has never detailed any substantial similarity between RCO-1 and Circa 2005 CUDP.

RCO's identification of protectable elements in its program, and determining how or whether they were copied, is crucial to this Court's evaluation of the *Kohus* test. In an effort to evade this burden, RCO argues that the effort required to identify protectable elements is too cumbersome and unfair. (RCO's Reply Memorandum in Support of Summary Judgment at 9, ECF 94). RCO argues that the source codes contain "millions of individual lines of code." (See *Id.*). But *Kohus* clearly requires that a plaintiff must identify the protectable elements in its copyrighted work, and produce some evidence that substantially similar elements exist in the accused program. This has not been done, and without such an analysis, no reasonable jury could find infringement of Plaintiff's copyrighted software.

### (4) RCO's Alleged Non-literal Elements at Issue

In order to prove substantial similarity between RCO-1 and Circa 2005 CUDP's non-literal elements, RCO promised to offer expert testimony on "similarities between the two products, including but not limited to aspects of structure, sequence, and organization, and screen displays." (See Plaintiff RCO's Notice and Description of Copyright Claim, ECF 44, ECF 48 at Ex. D at 6). But nowhere in this record are the non-literal elements of its computer program evaluated, cited, analyzed or identified by RCO. In fact, their sole "expert's" opinion report was so noncompliant with the pertinent Federal Rules of Civil Procedure, it was struck. (See generally, ECF 75). Therefore, no evidence exists from which RCO can make a showing that protectable non-literal elements of RCO-1 exist, or whether those elements are substantially

7

similar in Circa 2005 CUDP. In fact, some authority suggests that to the extent screen displays are at issue, the standard to be employed would be "virtual identicality" as opposed to substantial similarity. See *Mitek Holdings Inc. v. Arce Engineering Co., Inc.* 89 F.3d 1548, 1559 (11th Cir. 1996). RCO has made no showing on these issues whatsoever, revealing a fatal flaw in its copyright infringement case.

Plaintiff RCO will almost certainly argue that the destruction of the server hard drives leased from RCO to CSE are the sole cause of its inability to establish its case. But even assuming *arguendo* that such destruction was improper (which it was not, as detailed in the summary judgment briefing on those claims), the hard drive data would have established, at most, that Defendants viewed the RCO-1 source code. The hard drives could not establish that Plaintiff's own software RCO-1 contains copyrightable elements, nor could they establish that Circa 2005 CUDP contains elements that are substantially similar or identical to those in RCO-1. In short, the evidence on the destroyed hard drives could not possibly repair all the missing links in Plaintiff's chain of evidentiary burdens.

### B. PLAINTIFF'S TRADE SECRET CLAIMS LACK MERIT

Plaintiff contends Defendants are liable for misappropriation of Plaintiff's trade secrets. (See Plaintiff's Amended Complaint at 4-5, ECF 77). Plaintiff asserts Defendants gained unauthorized access to RCO's software maintained at CSE and that "misappropriation" sufficient to constitute a violation of Ohio's Trade Secret Act, R.C. 1333.61 et seq. occurred.

#### (1) Plaintiff cannot establish it has a protectable trade secret.

But the facts do not support any claim for misappropriation of trade secrets. For a plaintiff to prevail in an action for misappropriation of a trade secret, the plaintiff must first establish "that a trade secret exists." *Penetone Corp.v. Palchem Inc.*, 627 F. Supp. 997, 1005

(N.D. Ohio 1985); *see also Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 24 Ohio St.

3d 41, 44 (Ohio 1986); *Power Mktg. Direct, Inc. v. B. Ball*, 2004 U.S. Dist. LEXIS 29068, 13-14

(S.D. Ohio 2004), *citing Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974).

> Ohio law defines a "trade secret" as:
>
> (D) "Trade secret" means information, including the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:  (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.   (2) It is the subject of **efforts** that are reasonable under the circumstances to maintain its secrecy. R.C. §1333.61(D) (emphasis added).

Therefore, to demonstrate the existence of a trade secret, plaintiff must show reasonable

"efforts" to maintain secrecy.  RCO cannot do this.  Its software was never run under conditions

of secrecy.



By condoning this, plaintiffs were fully aware third parties would be handling PC interface

issues for their clients and viewing RCO's software program in the process.  (See id.)  CUI's

terminal emulation program was used in conjunction with RCO-1, and RCO permitted and

acknowledged CUI to view and assist RCO-1 for this purpose.  (See id.).  At no point was CUI

under contract or employed by RCO.  (See Exs. A and B at 1, ¶ 4).  Therefore, no secrecy exists

as to RCO-1's interaction with CUI's terminal emulation product or any other ones, the users of

9

same, or the RCO-1 screen displays.  The operation of RCO-1 was not secret, and RCO was well aware that it was operated by persons who were not subject to any privacy or secrecy obligations.

Also, RCO's data processing contract with CSE does not mention the existence of trade secrets, or describe any duty to take reasonable efforts to maintain the secrecy of plaintiff's alleged trade secrets.  (See Amended Complaint, Ex. A generally, ECF 77).  "Such a basic precaution would seem to be necessary for reasonable measures to have been taken to protect the alleged trade secret." See *Power Mktg. Direct, Inc. v. B. Ball,* 2004 U.S. Dist. LEXIS 30016 at 15-16. (where a licensing agreement did not label specified materials trade secrets and did not require Defendants to maintain their secrecy, no trade secret existed), *citing Hildreth Mfg. v. Semco, Inc.*, 151 Ohio App. 3d 693, 709 (2003).

Plaintiff RCO further alleges that its source code is a trade secret.  Nothing could be further from the truth. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████ And if its own distribution of the source code to hundreds of its customers (and all their third-party support vendors) were not enough, RCO registered its source code for copyright protection, distributed portions of its source code to the United States Copyright Office, and failed to track the distribution or secrecy of its source code during the application process.  (See Amended Complaint, p.6, ¶ 34; See

Olmstead Dep., pp. 19, lines 4-13; pp. 31, lines 1-22, ECF 87-2; Ex. D, which is Radcliffe Dep. dated October 1, 2008, pp. 17-18, lines 22-24, 1-5; pp. 42-43, lines 18-24, 1-21; pp. 43-44, lines 21-24, 1-6). This failure to protect its source code as if it were a trade secret during the copyright registration process further reveals a lack of reasonable efforts to do so. In sum, the only "effort" RCO made to protect its source code was to rely on the lack of sophistication of RCO-1's daily users, and their lack of curiosity. Certainly, no reasonable jury would find that RCO's actions (or lack thereof) constitute reasonable efforts to maintain a trade secret under Ohio law.

### (2) Plaintiff has no evidence of improper means

Under Ohio law, "misappropriation" occurs: (1) by improperly *acquiring* the trade secret; or (2) by improperly *disclosing* or *using* the trade secret. *See* R.C. 1333.61(B)(1) and (2) (emphasis added).

    *(a)    No acquisition of any trade secret can be shown*

Plaintiff cannot support a claim Defendants *acquired* their trade secrets. The acquisition prong requires the defendant to engage in "improper means." R.C. 1333.61(B)(1). R.C. 1333.61(A) provides: "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach to maintain secrecy, or espionage through electronic or other means."

The list clearly requires wrongful conduct. Defendants have no evidence to support that CUI or CSE engaged in any "improper means" in regards to RCO's hardware, software, or alleged trade secrets. In fact, Defendants never engaged in any improper means regarding RCO's software program, copyrighted materials, or proprietary information. (See Exs. A and B, p.p. 3-4, ¶¶ 17-25). Without showing improper means used by CUI, no acquisition can be shown and Defendants prevail as a matter of law.

11

Plaintiff RCO will almost certainly argue that the destruction of the server hard drives leased from RCO to CSE is the sole reason that it cannot demonstrate "improper means" in the Defendant's alleged viewing of its trade secrets.   As discussed in the spoliation summary judgment briefing, RCO has failed to demonstrate that any electronic evidence of viewing was ever created, and therefore cannot establish a *prima facie* case of spoliation.  But even assuming *arguendo* that this Court holds that CSE's destruction of the hard drives creates an adverse evidentiary inference against CSE, such an inference cannot stretch to cover the giant gap in RCO's case: the absence of "improper" access.  In other words, even if the hard drives would have shown that the Defendants looked at files in the "source" directory, there is nothing in the written contract between RCO and CSE, or even in the course of dealing between the parties, that would make such viewing "improper" for the purposes of Ohio trade secret law.

(b)      *No disclosure or use of a trade secret can be shown*

Similarly, Plaintiff has no evidence that Defendants *improperly* disclosed or used a trade secret.  The disclosure or use prong also requires the defendant to engage in "improper means." R.C. 1333.61(B)(2)(a) and (b).  Just as discussed above RCO has no evidence regarding any improper means.

R.C. 1333.61(B)(2)(b) also prohibits disclosure or use where the [trade secret]:

"was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain secrecy or limit its use"

But Defendants did not use or incorporate any of RCO's software or trade secrets while under a duty to maintain secrecy.   (See Exs. A and B, p. 1, ¶ 4, pp. 3-4, ¶¶ 17-25; Ex. D at 31-32, lines 18-24, 1-8).  CUI had no contractual relationship at all to RCO. (See id.).  And CSE's relationship with RCO was governed solely by the data processing contract.  Nowhere in that

12

contract does RCO assert trade secret status for RCO-1, RCO-1's source code, or any other materials. (See Amended Complaint, Exhibit A generally, ECF 77).

Simply put, Plaintiff has not met its burden to demonstrate the improper use of trade secrets. Courts have long recognized "[t]rade secrets are protected only when they are disclosed or used *through improper means*." *Glasstech, Inc. v. TGL Tempering Systems, Inc.*, 50 F. Supp. 2d 722, 729 (N.D. Ohio 1999) (emphasis added). Indeed, the Supreme Court has held that the "protection accorded the trade secret holder is against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided *under the express or implied restriction of nondisclosure or nonuse*." *Kewanee Oil*, 416 U.S. at 475 (emphasis added). Accordingly, Plaintiff cannot persuade a reasonable jury on this record that such improper means were used.

### C. RCO AUTHORIZED THE ACTIONS THAT FORM THE BASIS FOR ITS DMCA CLAIM.

As detailed above, CSE and CUI had RCO's express authorization to access RCO's program. In fact, RCO intended that CSE and CUI be able to "abort" RCO's program. Accordingly, RCO's claim for violations of the Digital Millenium Copyright Act (hereinafter, the "DMCA") fails as a matter of law.

The DMCA was designed to prohibit the pirating of copyright-protected works such as movies, music, and computer programs. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 552 (6th Cir. 2004). The DMCA provides in relevant part:

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that:
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

13

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

17 U.S.C. § 1201(a)(2).

To establish liability under the DMCA, a plaintiff must establish two elements:

(1)     defendant trafficked in a technology; and
(2)     the technology was primarily designed or produced to circumvent conditional access controls to protected works, or has limited commercially significant use other than such circumvention.

*CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 110 (1st Cir. 2008).

To "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner.  17 U.S.C. § 1201(a)(3)(A).

Under the DMCA, a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.  17 U.S.C. § 1201(a)(3)(B)

Here, RCO argues that CSE and CUI circumvented RCO's technological measures to gain access to RCO's software and hardware at CSE by two distinct means: (1) by using a password/username without its authorization, and (2) by using the Control C keystroke combination to "abort" RCO's program.



14

See Ex. D, p. 15, ll. 19-24, p. 16, ll. 1-2.



Id. at p. 17, ll. 2-7.

Accordingly, RCO concedes that the only two technological measure at issue are the "password protection" and "ability to abort" RCO's program.

**1.     RCO gave CSE its express permission to hire a third-party computer support company.**

Because RCO authorized CSE to hire CUI and because RCO to create authorized CSE to create passwords/usernames so that its employees and computer support personnel could access RCO's system, CSE and/or CUI did not violate the DMCA.  Moreover, even if CSE and/or CUI exceeded RCO's authorization to issue passwords/usernames, such actions do not violate the DMCA. *I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*, 307 F. Supp. 2d 521 (S.D.N.Y. 2004). *Berkshire Info. Sys.* is relevant to the instant facts.  In *Berkshire Info. Sys.* case, the federal district court found that the unauthorized use of a password did not constitute circumvention under the DMCA. *Id.* at 530-33. While the defendant was not given permission to use the password from the password owner, the court held that his action was not a circumvention of the password protection. *Id.* at 532-33.  The *Berkshire Info. Sys.* court found that the defendant's actions did not avoid or bypass the password protection. *Id.* That court noted that what the defendant avoided was the permission to use the password, and that was not the situation the DMCA was written to address. *Berkshire Info. Sys.* holds that the DMCA deals with situations where the digital walls guarding copyrighted material are avoided. *Id.*

Since RCO gave CSE express permission (pursuant to the contract that RCO drafted) to allow CUI to enter the its data processing system, it cannot now claim that CSE did not have the authority to give CUI (i.e., "a local Personal Computer support firm") access to RCO's system to set up PC's and perform interface maintenance.  This argument is disingenuous on its face.  Further, even if CSE somehow exceeded the scope of RCO's authorization to issue passwords, such action does not violate the DMCA.  Because CSE had an obligation to hire CUI (or another computer support firm), and had authorization to issue passwords, The DMCA claim must be dismissed as a matter of law.

### 2.    RCO permitted CSE employees to abort the RCO-1 program.

In its complaint, RCO alleges that its computer source code is a trade secret, but as discussed above, RCO failed to install technological measures to prevent anyone from accessing the source code. In fact, any user of RCO's system could access the source code via a simple key-stroke combination (i.e., Control-C).  In fact, RCO also authorized its credit union clients to utilize the key-stroke combination if they encountered certain problems.



See Ex. D at p. 13, ll. 8-12.



16

*Id.* at p. 111, ll. 14-24 and p. 112, ll. 1-4. Defendant's Exhibit No. 25 referenced above in the deposition testimony and identified as "User Privileges," is attached hereto as Ex. E.

Accordingly, RCO placed no restrictions on who could use the key-stroke "abort" function and even identified it in their "User Privileges" documentation provided to CSE. Again, *I.M.S. Inquiry Mgmt. Sys. v. Berkshire Info. Sys.*, supra, where the unauthorized use of a password did not constitute circumvention under the DMCA, held that the DMCA was limited to situations where the digital walls guarding copyrighted material are avoided. *Id.* at 530-33.

Here, Defendants did not circumvent any technological measure protecting RCO's source code by using the Control-C key stroke. RCO gave all its clients, including CSE, the ability and authorization to abort to the operating system by informing them of the Control-C key stroke mechanism. Because RCO expressly authorized CSE to use the Control C key stroke mechanism, there was no "circumvention" of a security feature.

## D. DEFENDANTS' ACTS WERE JUSTIFIED AND NO BREACH OCCURRED.

Plaintiff RCO alleges Defendants tortiously interfered with Plaintiff's contractual and business relationships (Amended Complaint, ¶¶ 5-6, ECF 77). As a matter of law, Defendants are entitled to summary judgment on these claims also.

To recover for tortious interference with a contract in Ohio, a plaintiff must plead and prove: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of justification; (5) and resulting damages. *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St. 3d 415, syllabus (1995). Similarly, "the elements of tortious interference with a business relationship are (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom."

*Diamond Wine & Spirits v. Dayton Heidleberg Distributing Co., Inc.*, 148 Ohio App.3d 596, 2002-Ohio-3932, at 23, citing Geo-*Pro Serv. Inc. v. Solar Testing Laboratories, Inc.* 145 Ohio App.3d 514, 525 (2001). The main difference between tortious interference with a contract and tortious interference with a business relationship is whether a business relationship has been reduced to a contract. *Id.*

Each of the former client relationships identified by RCO in this case were under a written contract. (See Ex. F, which is Kambietz Dep., pp. 22-23, lines 24, 1-3, p. 26, lines 4-24; Ex. G, which is Lieb Dep., pp. 33-34, lines 13-24, 1-23). In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ (See Ex. F at 33-34, lines 22-24, 1-14; Ex. G at 96-97, lines 1-24, 1-5). Therefore, no interference with a "business relationship" can exist. Accordingly, with a written contract in place, RCO must demonstrate that the Defendants induced some breach of their contracts. But again, RCO admitted that none of the customers at issue breached their contract with RCO. (See Ex. G at 33-34, lines 13-24, 1-23). In fact, RCO terminated its relationship with CSE not vice-versa. (See Ex. H, RCO's Letter from Douglas Rogers terminating contract with CSE dated 5-8-06, CSE 00014-00015).

Even assuming *arguendo* that some evidence of breach of contract exists, that does not end the analysis. To determine whether interference is tortious, trial courts must consider the nature of the actor's conduct, the motive behind the conduct, the interests with which the actor interferes, the interests being advanced by the actor, societal interests in protecting the freedom of action and the existing business relationships of the other, the proximity between the interference and the failure of the relationship, and the relationship between the actor and the other. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 176 (Ohio 1999).

In applying these factors, the Ohio Supreme Court has adopted the "privilege of fair competition." *Id.* at 179–80. The privilege shields an alleged interferor from liability where the interfered-with business relationship was at-will, and the interference arose in the context of business competition. *Id.* That is, so long as the competitor does not employ "wrongful means," "interference with a terminable at-will contract... is not improper." Id.; see also *Crown Equipment Corp. v. Toyota Material Handling U.S.A., Inc.*, 2005 U.S. Dist. LEXIS 25741, (N.D. Ohio 2005); *Northeast Ohio College of Massotherapy v. Burek*, 144 Ohio App.3d 196, 209 (7th Dist. 2001).

The privilege of fair competition will "defeat a claim of tortious interference with prospective contractual relationship." *The Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1043 (N.D. Ohio 2003) (Wells, J.). The fact finder or court need not consider any other factors; the interference, to the extent it exists, must be considered non-tortious. *Northeast Ohio College of Massotherapy*, 144 Ohio App. 3d at 209.

Because Plaintiff's business relationships with its customers were terminable at-will with notice, Plaintiff's competitors like CUI act under the privilege of fair competition. Without specific evidence of wrongful conduct sufficient to defeat the well-recognized privilege of fair competition, RCO cannot escape the granting of summary judgment, because developing, marketing and selling a product in the context of a competitive environment is permitted and encouraged in the United States.

As a result, Plaintiff's claims for tortious interference with contracts or business relationships cannot survive summary judgment, for failure to produce any evidence of essential elements of those claims.

#### E.   CSE HAD A CONTRACT AND CUI RECEIVED NO BENEFIT

Without any supporting detail, Plaintiff alleges that Defendants "have been unjustly enriched, at RCO's expense, through their unlawful conduct." (Amended Complaint at p. 9, 51-52, ECF 77).   However, the doctrine of unjust enrichment does not apply when a contract actually exists; it is an equitable remedy applicable only when the court finds there is no contract. *Hummel v. Hummel* (1938), 133 Ohio St. 520, 525-528. (unjust enrichment applies only where there is no express, unambiguous contract and no demonstration of fraud or bad faith). Where a contract exists, as is the case here, summary judgment in CSE's favor must be granted. And without some evidence of a "benefit" conferred by RCO to CUI, summary judgment must also be granted in its favor.  (See Exs. A and B, p.5, ¶ 26).

### IV.   CONCLUSION

Clearly, evidence is either wholly lacking or legally insufficient for essential elements of all Plaintiff's claims.  As such, no genuine issue of material fact exists as to of each of RCO's claims and Defendants are entitled to judgment as a matter of law.

Respectfully submitted,

/s/ Andrew Mills Holford
Andrew Mills Holford (#0074091)


/s/ Stephen M. Nowak
George Carr (#0069372)
Stephen M. Nowak (#0078349)
GALLAGHER SHARP