# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **R.C. OLMSTEAD, INC.,** | ) | **CASE NO. 5:08CV234** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE SARA LIOI** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| **CU INTERFACE, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This Memorandum Opinion and Order arises out of the following:

(1) The motion of Plaintiff R.C. Olmstead, Inc. ("RCO") for partial summary judgment on its claims against Defendants Software Properties LLC, CU Interface LLC ("CUI"), and Thomas Burkhart (collectively, "Developer Defendants") for misappropriation of trade secrets, copyright infringement, and violation of the Digital Millennium Copyright Act (DMCA). (Doc. No. 100.) Defendants have filed an opposition (Doc. No. 119), and RCO has filed a reply (Doc. No. 133).

(2) The motion of Developer Defendants for summary judgment[1] on the claims of RCO for misappropriation of trade secrets, tortious interference with contractual and business relationships, copyright infringement, violation of the DMCA, and unjust enrichment. (Doc. No. 101.) RCO has filed an opposition[2] (Doc. No. 125), and Defendants have filed a reply (Doc. No. 132).

For the reasons that follow, the motion of RCO for partial summary judgment is **DENIED** and the motion of Developer Defendants for summary judgment on all of RCO's remaining claims against Defendants is **GRANTED**.

## I. FACTUAL AND PROCEDURAL HISTORY

Unless otherwise noted, the following are undisputed facts. RCO is an Ohio corporation that develops and sells data processing software, hardware, and related services to

---

[1] RCO also levied claims of spoliation of evidence and breach of contract against Canton School Employees Federal Credit Union ("CSE"), a former defendant in the case. (*See* Am. Compl., Doc. No. 77.) However, RCO and CSE reached a settlement agreement, and accordingly those claims are no longer before this Court. (*See* Minutes of Proceedings, 2/20/2009; Doc. Nos. 145, 152.)

[2] As noted in a prior Order of this Court, RCO's opposition was untimely filed, but the Court nonetheless has decided to consider it. (Doc. No. 149.)

credit unions in Ohio and nationwide. On November 17, 1999, RCO entered into a Data Processing Agreement (the "Agreement") with Canton School Employees Federal Credit Union ("CSE"). (Barnes Dep. I[3] at 56-57; Data Processing Agreement, Kambeitz Aff. Ex. 1.) Under the Agreement, RCO licensed the use of its hardware and credit union processing software to CSE for a five-year term. (Data Processing Agreement at 5.) RCO retained ownership of the hardware and software at all times. (*Id.*) An individual could gain access to RCO-1 only by entering a username and password (Radcliff Dep.[4] at 15-16), but the Agreement did not restrict to whom CSE could issue usernames and passwords.[5] (*See* Data Processing Agreement.) In fact,

RCO's software, known as RCO-1, was designed to run on a single OpenVMS server, but also could run on other "dumb terminals"—that is, other personal computers connected to the server—through the use of an emulator. (West Dep. at 67-68; Akin Aff. ¶¶ 5-6; Burkhardt Aff. ¶¶ 5-6.) The Agreement provided that CSE would be responsible for acquiring a local support firm to perform maintenance and support for all personal computers. (Data Processing Agreement at 3.) The Agreement also indicated that any troubleshooting assistance provided by RCO would be billed to CSE at an hourly rate. (*Id.*) As permitted by the Agreement, CSE hired Defendant CUI—a developer, marketer, and seller of credit union data processing

---

[3] R. Stanley Barnes gave two depositions, on July 25, 2007, and on September 29, 2008. The former will be cited as "Barnes Dep. I at __," and the latter will be cited as "Barnes Dep. II at __."

[4] Donald Radcliff gave two depositions in this case. The parties, however, generally have only utilized testimony from the second deposition, taken on October 1, 2008. Accordingly, all references to Radcliff's deposition refer to his deposition of October 1, 2008, unless explicitly noted otherwise.

[5] RCO has attempted to alter the Agreement after the fact by introducing the affidavits of Stephen Kambietz and Donald Radcliff, which state that "RCO customers are not authorized to permit non-credit union users to use or access the RCO software." (Kambietz Aff. ¶ 7; Radcliff Aff. ¶ 6.) This shallow attempt at ad hoc contract revision is neither pleasing nor persuasive to this Court. The Agreement between RCO and CSE contains no restrictions as to who CSE may issue usernames and passwords. (Data Processing Agreement.) Moreover, Donald Radcliff testified in deposition that RCO gives wide latitude to their credit union clients to issue usernames and passwords. (Radcliff Dep. of 7/28/08, at 94.) Insofar as RCO attempts to create a genuine issue of material fact by offering Kambietz's and Radcliff's affidavits to add to the Agreement or to contradict previous statements made under oath (i.e., Radcliff's deposition testimony), the Court deems those affidavits to be "sham testimony" that may justly be disregarded. *Aerel, SRL v. PCC Airfoils, LLC*, 448 F.3d 899, 906 (6th Cir. 2006); *Shahzade v. Gregory*, 930 F. Supp. 673, 676 (D. Mass. 1996); *Hankins v. Title Max of Alabama, Inc.*, 2006 WL 4393576, at *9 (N.D. Ala. Sept. 26, 2006).

2

software—to provide its maintenance and support. (Akin Aff. ¶¶ 1, 2, 7, 8, 9; Burkhardt Aff. ¶¶ 1, 2, 7, 8, 9.) RCO was aware that CUI provided this support and never voiced any opposition. (Olmstead Dep. at 204-05.)

On October 14, 2003, CSE entered into a Software Development Agreement (the "Development Agreement") with CUI to develop a new data processing program to replace RCO-1. (Barnes Aff. ¶ 4; Software Development Agreement, Radcliff Aff. Ex. 1.) The Development Agreement expressly required CUI to "use reasonable diligence to avoid infringement on the proprietary rights of any third party" to create the new software, and also provided that CSE could purchase an ownership interest in the CUI software.[6] (Software Development Agreement at 00021, 00024.)

The two primary CUI programmers were Jason Akin ("Akin"), one of the individuals who formed CUI in 2006 (Akin Aff. ¶ 3), and Jay Lash ("Lash"), a former teller at CSE who was hired to develop the interface for the new software (Lash Dep. at 7, 14, 22). The Developer Defendants contend that much of the requirements for the new software came from federal regulations and accounting principles, such as those promulgated by the National Credit Union Administration (NCUA) and found in the Generally Accepted Accounting Principles (GAAP). (Akin Aff. ¶¶ 14-16; Burkhardt Aff. ¶¶ 14-16; Akin Dep. I[7] at 83-84.) Lash heavily relied on his own experience as a CSE teller—and his work with several different credit union data processing interfaces during that period, including that of RCO—to develop the interface. (Lash Dep. at 19, 29.) Additionally, Lash and Akin also interviewed many CSE employees with regards to the jobs they performed and what the new software would be required in order to perform those jobs. (Akin Dep. I at 83-85; Lash Dep. at 30.) Lash and Akin also accessed the

---

[6] There is no indication in the record that this option has been exercised yet by CSE.
[7] Jason Akin gave two depositions, on July 26, 2007, and on September 29, 2008. The former will be cited as "Akin Dep. I at __," and the latter will be cited as "Akin Dep. II at __."

RCO interface with teller-level usernames and passwords during the development of the new software. (Akin Dep. I at 64-65; Akin Dep. II at 62; Lash Dep. at 22.) According to Akin and Lash, these teller-level accounts allowed them only to interact with a screen (Akin Dep. I at 65; Lash Dep. at 22)—Akin expressly denied that he or any other CUI employee accessed RCO's source code or programming code (Akin Aff. ¶ 25), and there is no evidence in the record to the contrary.

As CUI developed components of the new software, it released them as "modules," which were designed to work alongside the RCO-1 system. (Akin Dep. I at 138.) Thus, for a roughly two-year period, CSE was paying both RCO and CUI. RCO's own director of sales and marketing acknowledged that this type of double-payment is not unusual in the credit union industry, especially where a credit union desires to convert from one software to another. (*See* Lieb Dep. at 34-35.) Before CUI completed its new software, the Agreement between RCO and CSE was set to expire. (Data Processing Agreement at 5.) Not wishing to renew the RCO contract for another five years, CSE requested to extend the Agreement for an additional year, until March 30, 2006, to which RCO agreed. (Amendment to Data Processing Agreement, Kambeitz Aff. Ex. 2.) After March 30, 2006, the Agreement automatically renewed on a month-to-month basis until either party gave 60 days' written notice of termination. (*Id.*)

In October 2005, CUI's software—the CUDP Circa 2005 software—was complete, and CSE began transferring its customer data and operating the software developed by CUI; all of the customer data was archived by July 2006. (Barnes Dep. II at 15-16, 31; Akin Dep. II at 38.) CSE employees received training on the new CUI software. (Rodriguez Dep. at 37.) And while the transition from RCO-1 to CUDP Circa 2005 was relatively smooth, it had some initial problems. (Rodriguez Dep. at 34.)

4

RCO eventually learned that CSE had completely changed to using the CUDP Circa 2005 software, and on May 8, 2006, RCO provided CSE with written notice of RCO's termination of the Agreement, effective July 31, 2006. (Letter of Rogers to Barnes (May 8, 2006), Kambeitz Aff. Ex. 3.)

On January 29, 2008, RCO filed a Complaint against CSE and Developer Defendants. (Doc. No. 1.) RCO alleged that CSE breached its contract with RCO and that CSE spoliated evidence by refusing to return—and eventually destroying—a set of RCO hard drives. Against CSE, RCO also alleged misappropriation of trade secrets, contributory copyright infringement, violation of the Digital Millennium Copyright Act (DMCA), tortious interference with contractual and business relationships, and unjust enrichment. With respect to Developer Defendants, RCO claimed that they wrongly copied RCO-1 in the development of their own software product, and asserted claims for misappropriation of trade secrets, copyright infringement, violation of the DMCA, tortious interference with contractual and business relationships, and unjust enrichment.[8]

On October 30, 2008, and December 2, 2008, respectively, RCO and CSE filed cross-motions for partial summary judgment on RCO's spoliation and breach of contract claims against CSE. (Doc. Nos. 71 (redacted), 92 (unredacted) (RCO motion); Doc. No. 83, 87 (CSE motion).) RCO and CSE reached a settlement agreement between them, and accordingly these motions—as well as RCO's claims against CSE for spoliation, breach of contract, misappropriation of trade secrets, contributory copyright infringement, violation of the Digital Millennium Copyright Act (DMCA), tortious interference with contractual and business

---

[8] On October 15, 2008, RCO filed its Amended Complaint, adding Software Properties LLC, a successor corporation to CUI, as an additional Defendant; there were no other substantive changes. (Doc. No. 77.)

relationships, and unjust enrichment—are not before this Court. (Minutes of Proceedings, 2/20/2009; Doc. Nos. 145, 152.)

RCO also filed a separate motion for partial summary judgment on its claims against Developer Defendants for misappropriation of trade secrets, copyright infringement, and violation of the DMCA. (Doc. No. 100.) CSE, which at the time was still a Defendant in the case, and the Developer Defendants filed a joint cross-motion for partial summary judgment on RCO's remaining claims, i.e., misappropriation of trade secrets, copyright infringement, violation of the DMCA, tortious interference with contractual and business relationships, and unjust enrichment. (Doc. No. 101.) In light of the settlement between RCO and CSE, these motions are **MOOT** with respect to all claims by RCO against CSE. With respect to RCO's claims against Developer Defendants for misappropriation of trade secrets, copyright infringement, violation of the DMCA, tortious interference with contractual and business relationships, and unjust enrichment, however, these motions are ripe for review.

## II. STANDARD OF REVIEW

On motion for summary judgment, a party is entitled to judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denial of the adverse party's pleading," *id.*, but "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment," *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). A mere scintilla of evidence showing only "some metaphysical doubt as to the material facts" is not sufficient to defeat a motion for summary judgment.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citation omitted).  The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Street*, 886 F.2d at 1479; *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

The entry of summary judgment is not a disfavored procedural shortcut, but instead is mandated by "the plain language of Rule 56(c) [. . .] after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Of course, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the

essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex,* 477 U.S. at 322.

## III. LAW AND ANALYSIS

### A. Spoliation inference with respect to Defendants

Before addressing the merits of the parties' respective summary judgment motions, the Court finds it necessary to mention the nature of RCO's spoliation claim in light of RCO's settlement with former defendant CSE. RCO brought an independent claim of intentional spoliation against CSE under Ohio law, arising out of the destruction of RCO's hard drives by the Chief Executive Officer of CSE, R. Stanley Barnes. (Compl. ¶¶ 54-61.) RCO did not allege spoliation against Developer Defendants. (*Id.*) On February 20, 2009, RCO and CSE reached a settlement that resolved all claims between them, i.e., the breach of contract and spoliation of evidence claims.[9] (Minutes of Proceedings, 2/20/2009; Doc. Nos. 145, 152.) Despite that RCO's spoliation of evidence claim is no longer in the case, RCO nonetheless asks this Court to draw an adverse evidentiary inference against Developer Defendants for all of RCO's remaining claims. (*See* RCO Status Report, Doc. No. 147, at 2.)

Prior to February 2009, the Sixth Circuit held that state law governs the imposition of sanctions for spoliation. *See, e.g.*, *Beck v. Heik*, 377 F.3d 624, 641 (6th Cir. 2004); *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999). The Sixth Circuit has recently held, however, that "a federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence." *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009). In light of the recent change of law in the Sixth Circuit, this Court will clarify

---

[9] As a result of the settlement, the cross-motions of RCO and CSE for partial summary judgment on RCO's spoliation of evidence and breach of contract claims against CSE (Doc. Nos. 71, 92, 87) are **MOOT**.

whether an adverse evidentiary inference may be drawn against Developer Defendants under either the Ohio or federal law of spoliation.

**1. Ohio law**

Like in all other jurisdictions, Ohio courts have the inherent power to impose sanctions for spoliation of evidence as a matter of evidentiary law. *See, e.g.*, *Brokamp v. Mercy Hosp. Anderson*, 726 N.E.2d 594, 608-09 (Ohio Ct. App. 1999). However, Ohio also recognizes intentional spoliation of evidence as an independent cause of action in tort that may be brought against the primary defendant to an action or a third party to the action. *Smith v. Howard Johnson Co., Inc.*, 615 N.E.2d 1037, 1038 (Ohio 1993). To establish a tort claim of spoliation, a plaintiff must show: (1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of defendant that litigation exists or is probable; (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's acts. *Id.*

It is evident that RCO may not hold Developer Defendants liable for intentional spoliation under Ohio law. RCO did not bring an intentional spoliation claim against Developer Defendants; it only brought a spoliation claim against CSE. (*See* Compl. ¶¶ 54-61.) Thus, RCO cannot maintain a separate cause of action for spoliation against Developer Defendants, nor may RCO seek sanctions against Developer Defendants for committing the intentional spoliation tort under Ohio law. Furthermore, RCO's spoliation of evidence claim under Ohio law has already been dismissed with prejudice (Doc. No. 152); thus, this Court may no longer consider that claim.

Further, RCO cannot seek an adverse evidentiary inference against Developer Defendants for CSE's destruction of the hard drives under Ohio evidentiary law. Under *Adkins*,

9

federal law—not Ohio law—determines whether imposition of sanctions against Developer Defendants for CSE's spoliation is appropriate. The Court thus turns to federal law to determine if RCO may seek an adverse evidentiary inference.

### 2. Federal law

Under federal law, "[s]poliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (citing Black's Law Dictionary 1401 (6th ed. 1990)). There is no independent cause of action for spoliation under federal law,[10] *Lombard v. MCI Telecomm. Corp.*, 13 F. Supp. 2d 621, 628 (N.D. Ohio 1998), but a district court's inherent power to control litigation and protect the integrity of the judicial process allows it to impose sanctions against a party for spoliating evidence. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *see also* Fed. R. Civ. P. 37(b)(2). These sanctions may only be imposed against a party, however, upon a showing that (1) the evidence was relevant to the litigation, (2) the party was under a duty to preserve the evidence at the time it was altered or destroyed, and (3) the party acted with a requisite level of intent, which varies depending on the sanction sought. *Nucor Corp. v. Bell*, 251 F.R.D. 191, 194 (D.S.C. 2008) (citations omitted).

An adverse evidentiary inference against a party is one possible sanction for spoliation. This particular sanction, however, "is only appropriate if [that party's] 'willful conduct resulted in [the] loss or destruction [of the evidence].'" *Id.* (quoting *Vodusek v. Bayliner*

---

[10] RCO states in its motion for partial summary judgment that it seeks an adverse inference "[a]s one remedy for the spoliation claim" (Doc. No. 100 at 21), which can only be referring to its Ohio law theory since no claim of spoliation exists under federal law. Further, RCO has never sought sanctions against CSE or any of the Developer Defendants for spoliation under federal law. RCO has thus waived any claim to an adverse inference under federal law. Nonetheless, the Court will consider RCO's request for sanctions under federal law for purposes of completeness.

*Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)). Accordingly, courts have consistently refused to impose an adverse inference against a party where that party had no fault in the destruction of evidence and the evidence was in the custody or control of a third party.[11] *MacSteel, Inc. v. Eramet N. Am.*, 2006 WL 3334011, at *1 (E.D. Mich. Nov. 16, 2006); *Bell*, 251 F.R.D. at 196; *Reynolds v. Crown Equipment Corp.*, 2008 WL 2465032, at *8 (W.D. Va. June 16, 2008); *see also Silvestri*, 271 F.3d at 590 ("[A] court must find some degree of fault to impose sanctions."); 1 EDiscovery & Digital Evidence § 11:2 (Jay E. Grenig & William C. Gleisner, III, eds. 2008).

Given this backdrop, RCO is not entitled to an adverse inference against Developer Defendants even had it properly demanded one. It is undisputed that CSE had exclusive custody and control of the hard drives. (Barnes Dep. I at 87, 110.)  Further, RCO has failed to offer any evidence suggesting that any of the Developer Defendants engaged in any willful conduct that resulted in the destruction of the hard drives. It is undisputed that none of the Developer Defendants nor any of their agents destroyed the hard drives. (Akin Spoliation Aff. ¶ 8, Doc. No. 86 Ex. 1.) While a party can be sanctioned for spoliation by one of its agents, *Bell*, 251 F.R.D. at 196; *Reynolds*, 2008 WL 2465032, at *8, there is no evidence that Barnes was an agent of any of the Developer Defendants. (Akin Spoliation Aff. ¶¶ 5-7, 9.) RCO also has not offered any evidence suggesting that any of the Developer Defendants took a purposeful or negligent action that resulted in CSE's destruction of the hard drives. *See Reynolds*, 2008 WL 2465032, at *8 (noting that a spoliation inference may be appropriate where a party takes a purposeful or negligent action that results in the destruction of evidence).

---

[11] The Court notes here that Ohio law employs the same standards. Under Ohio law, an adverse evidentiary inference may be drawn against a party only upon "a strong showing of malfeasance—or at least gross neglect [. . .]." *Sullivan v. Gen. Motors Corp.*, 772 F. Supp. 358, 364 (N.D. Ohio 1991) (citing *Banks v. Canton Hardware Co.*, 103 N.E.2d 568, 573 (Ohio 1952)). Ohio courts do not permit an adverse evidentiary inference against a party where that party did not have custody or control of the evidence and there is no misconduct or gross neglect by that party in preserving the evidence. *See, e.g., Schwaller v. Maguire*, 2003 WL 22976339, at *5 (Ohio Ct. App. Dec. 19, 2003). Thus, even if RCO were to seek an adverse instruction under Ohio law, the Court would engage in a practically identical analysis as under federal law.

Since RCO has failed to offer any evidence suggesting that any Developer Defendant was at fault in any way for CSE's apparently unilateral decision to destroy the hard drives, Developer Defendants cannot be sanctioned for spoliation under federal common law.

### 3. Conclusion

For the foregoing reasons, Developer Defendants cannot be sanctioned for CSE's spoliation of evidence under either Ohio or federal law. Accordingly, RCO is not entitled to an adverse evidentiary inference with respect to any of its claims against Developer Defendants.

## B. DMCA

The parties have filed cross-motions for summary judgment on RCO's DMCA claim. The DMCA forbids any person from "circumvent[ing] a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). To "circumvent a technological measure" is "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A).

The evidence in this case shows that RCO-1 utilized only two security features: password protection for logging in to RCO-1, and the ability to abort the RCO application using a Control-C keystroke. (Radcliff Dep. at 15-16.) RCO alleges that Defendants have circumvented the password protection security feature by allowing CUI employees to log in to the RCO application using the usernames and passwords of CSE employees.[12] Courts have rejected an argument similar to RCO's. For example, in *I.M.S. Inquiry Mgmt. Sys. v. Berkshire*

---

[12] It appears that RCO alleged at one time that Developer Defendants improperly used the Control-C keystroke as another means of circumventing a technological measure. (*See* Compl. ¶¶ 47-49 (alleging that Developer Defendants circumvented "technological measures," plural, to gain access to the software.) RCO, however, has abandoned this argument in its summary judgment briefing. Accordingly, Developer Defendants are entitled to judgment as a matter of law with respect to the Control-C DMCA theory. *See Beery v. Assoc. Hygienic Prods., LLC*, 243 F. App'x 129, 132 (6th Cir. 2007); *Burnett v. Kelley*, 274 F. App'x 427, 429 (6th Cir. 2008). Abandonment notwithstanding, the Court notes that undisputed evidence shows that the Control-C keystroke was a user privilege that RCO granted to CSE without restriction. (*See* Radcliff Dep. at 13, 111-12.)

*Information Sys., Inc.*, 307 F. Supp. 2d 521 (S.D.N.Y. 2004), plaintiff owned a web-based service accessible to its clients only upon entering a unique username and password. *Id.* at 523. Defendant obtained a username and password from one of plaintiff's clients and used it to access plaintiff's website. *Id.* The court found that defendant did not "avoid[] or bypass[] the deployed technological measure in the measure's gatekeeping capacity," but rather "avoided and bypassed [. . .] *permission* to engage and move through the technological measure from the measure's author." *Id.* at 532 (emphasis in original). The latter, the Court held, was insufficient to establish a claim for relief under the DMCA. *Id.* at 532-33.

The facts of this case are indistinguishable from *Berkshire*, which this Court finds to be persuasively reasoned. RCO provided CSE with a software license under which CSE could issue usernames and passwords to access the software without restriction. (Data Processing Agreement; Radcliff Dep. of 7/28/08, at 94.) CUI accessed RCO-1 through the use of these usernames and passwords. Thus, like in *Berkshire*, CUI did not "surmount or puncture or evade any technological measure [. . .]," *id.*, but instead it used a username and password that it was issued by CSE. Further, given that the Agreement between CSE and RCO did not set any restrictions regarding issuance of usernames and passwords, RCO cannot even show that CUI's use of a username and password was inappropriate. Simply put, CUI did not circumvent or bypass any technological measures of the RCO software—it merely used a username and password—the approved methodology—to access the software. Accordingly, RCO's motion for partial summary judgment on its DMCA claim is **DENIED** and Developer Defendants' motion for the same is **GRANTED**.

**C. Copyright infringement**

The parties have filed cross-motions for summary judgment on RCO's copyright

infringement claim. The Copyright Act protects the literal program code of a computer program as well as the programs controlling the internal operations of the software. *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997); *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 523 (9th Cir. 1984). In addition, the Copyright Act protects audiovisual works fixed in a tangible medium of expression, such as user interfaces. 17 U.S.C. § 101(a)(6); *Williams Electronics, Inc. v. Arctic Int'l, Inc.*, 685 F.2d 870, 874 (3d Cir. 1982); *Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741, 746 (N.D. Ill. 1983).

"To succeed in a copyright infringement action, a plaintiff must establish that he or she owns the copyright creation, and that the defendant copied it." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). A plaintiff may prove copyright infringement either by providing direct evidence of copying, or by providing indirect evidence of copying through showing (1) access to the original work, and (2) substantial similarity between the original work and the allegedly infringing work. *Kohus*, 328 F.3d at 854. In either case, though, it is axiomatic that "[n]ot all 'copying' is actionable [. . .]; it is a constitutional requirement that a plaintiff bringing an infringement claim must prove 'copying of constituent elements of the work *that are original*.'" *Kohus*, 328 F.3d at 853 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)) (emphasis in original).

RCO claims that it has both direct and indirect evidence of copying. The Court disagrees and finds that Developer Defendants are entitled to summary judgment on RCO's copyright infringement claim for the reasons that follow.

**1. Direct evidence of copying**

RCO alleges that it has direct evidence of copying in two respects. First, RCO argues that, by accessing the RCO-1 software on their computers, CUI employees launched the

14

copyrighted program without authorization, which constitutes copyright infringement. Second, RCO alleges that admissions by CUI and CSE employees show that CUI programmers engaged in a multi-year effort to access and copy the RCO-1 program. RCO has failed to provide probative evidence sufficient to create a genuine issue of material fact as to either.

### a. Virtual copying of RCO-1

In its motion for partial summary judgment, RCO alleges that Developer Defendants infringed RCO's copyright when CUI employees ran RCO-1 on their own computers without authorization. (Doc. No. 100 at 20-21.) Defendants are entitled to summary judgment on this theory for two reasons.

First, RCO waived this theory by not timely raising it. On April 17, 2008, this Court ordered RCO to disclose the specific nature of its copyright claims on or before July 1, 2008; in a later Order, the Court extended this deadline to within 10 days after RCO's expert examination of the CUDP Circa 2005 software. (Minutes of Proceedings, 4/17/2008; Doc. No. 34.) In its disclosure, RCO relied only upon Defendants' alleged copying of the RCO-1 software to create the CUDP Circa 2005 product. (*See* Doc. No. 48 Ex. D.) RCO did not hint that virtual copying formed a basis for its copyright claims, and it has never sought leave to amend its complaint to include virtual copying. Thus, the Court deems RCO to have waived this theory, and Developer Defendants are entitled to judgment as a matter of law on virtual copying.

But even if this Court were to consider RCO's copyright claim to the extent it is based upon a theory of virtual copying, Developer Defendants are still entitled to judgment as a matter of law on the merits. RCO is correct that "load[ing] validly copyrighted software onto [a] computer without the owner's permission, then us[ing] the software for the principal purpose for which it was designed" is a form of copyright infringement. *Stenograph LLC v. Bossard Assocs.,*

15

*Inc.*, 144 F.3d 96, 100 (D.C. Cir. 1998); *see also Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 261 (5th Cir. 1988). However, undisputed evidence shows that RCO-1 only ran on a single OpenVMS server, and was available on each terminal or personal computer ("dumb terminals") through an emulator. (West Dep. at 67-68; Akin Aff. ¶¶ 5-6; Burkhardt Aff. ¶¶ 5-6.) Thus, the RCO-1 software was never actually loaded or copied onto any of the computers, including those operated by CUI. Since RCO has offered no evidence suggesting that Defendants loaded RCO-1 onto any other mainframes or servers, Developer Defendants are entitled to judgment as a matter of law with respect to this theory of infringement.

### b. Other direct evidence

RCO alleges that it has obtained other "significant direct evidence of copying by Defendants." (Doc. No. 100 at 22.) RCO's evidence is neither significant nor probative of copying. It is highly unusual for there to be direct evidence of copying, since allegedly infringing parties will rarely admit to it, and thus courts typically only find direct evidence of copying in extreme circumstances. Two examples suffice to illustrate this point. First, in *Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992), an artist created a black-and-white photograph entitled "Puppies," which featured a man and his wife holding eight German Shepherd puppies. *Id.* at 304. It was undisputed that substantial creative efforts went into the photograph, including lighting, location, use of props, and positioning of the human and animal subjects. *Id.* "Puppies" became rather famous and was exhibited a number of times. *Id.* Defendant, a sculptor, purchased a reproduction of the photograph on a Museum Graphics postcard and, after tearing off the portion showing plaintiff's copyright, gave the picture to his artisans and ordered them to copy it. *Id.* at 304-05. Defendant visited the studio at least once a week, frequently giving instructions to his workers to carve the sculpture in a manner more faithful to the picture. *Id.* The Second Circuit found this

case to be "the rare scenario where there is direct evidence of copying," since defendant "gave a copy of the photograph to the Italian artisans with the explicit instruction that the work be copied" and stressed "the very details of the photograph that embodies plaintiff's original contribution—the poses, the shading, the expressions [. . .]." *Id.* at 307.

*Broderbund Software, Inc. v. Unison World, Inc.*, 648 F. Supp. 1127 (N.D. Cal. 1986), is another rare example of direct evidence of copying. The undisputed facts showed that both the president and products manager of defendant ordered defendant's programmers to copy "Print Shop," a software program created by plaintiff. *Id.* at 1130-31, 1135. The programmers testified that they executed these orders to the best of their abilities. *Id.* at 1135. The copying was exceptionally obvious from the screens of the infringing program, which the products manager attributed to the "programmers' intense concentration on copying 'Print Shop.'" *Id.* The programmers similarly testified that they had produced an exact copy of "Print Shop," and even discarded any ideas for different user interfaces because their work on the copied version of the interface was much further along. *Id.* The court thus found that "plaintiffs [. . .] adduced sufficient direct evidence of copying to prove infringement of the protected portions of 'Print Shop.'" *Id.*

It is worth noting that, unlike the plaintiffs in the above cases, RCO has presented no evidence that CUI employees admitted to copying RCO-1 or that CUI ordered programmers to copy any protectable aspect of RCO-1. RCO has also offered no evidence that CUI employees accessed the RCO-1 programming code; indeed, the only evidence in the record indicates to the contrary. (Akin Aff. ¶ 25; Burkhardt Aff. ¶ 25.) Instead, RCO's claim of direct evidence rests entirely upon the following facts,[13] construed in a light most favorable to RCO:

_____

[13] On its direct evidence claim, RCO's summary judgment practice has been, to say the least, highly disingenuous. Most of RCO's "analysis" consists of conclusory statements that Developer Defendants copied RCO's software,

(1) CSE and CUI entered into a joint software development agreement, and pursuant to that agreement two CUI employees set up offices in the same building (though not the same office space) as CSE (Doc. No. 100 Ex. 3; Akin Dep. I at 65-66);

(2) Akin accessed the RCO interface with a CSE teller-level password "multiple times a week" (Akin Dep. I at 64-65; Akin Dep. II at 62);

(3) Lash, a former CSE employee who used the RCO software, was employed by CUI to design the CUDP Circa 2005 interface (Lash Dep. 14, 22);

(4) Akin interviewed CSE employees about their occupations and interactions with the RCO interface in order to obtain knowledge about credit union operations and the kind of operations that are necessary and desirable in credit union software[14] (Akin Dep. I at 83-85); and

(5) Kathy Tampian, who coordinated interviews between CUI and CSE employees, did not place any restrictions on the types of questions CUI employees could ask, nor the information CSE employees could disclose—including about the RCO system (Tampian Dep. at 21-23).

At absolute most, the above evidence—construed in a light most favorable to RCO—shows that

CSE and CUI entered into a joint software development agreement, that some CUI programmers

spoke with CSE employees about their experiences with the RCO system, and that two CUI

---

sprinkled with a few citations that are rarely probative and often misleading. Additionally, RCO makes claims that are unsupported or contradicted by the evidence. Citing to page 7 of her deposition, RCO states that Kathy Tampian, CSE Vice President of Finance and Operations, was a former long-term RCO employee who used her knowledge of RCO-1 to assist CUI's copying efforts. Page 7 of Tampian's deposition contains no mention that Tampian was employed at RCO or that she used knowledge of RCO-1 to further copying efforts, and the Court has been unable to locate any testimony in the record indicating as much.

      RCO also claims that a CSE teller, Tracie Rodriguez, described the transition between the RCO and CUDP Circa 2005 softwares as "seamless" and did not receive any additional training on CUI's software. (See, e.g., Doc. No. 125 at 9.) Yet when asked "Do you recall [the transition] being a seamless transition," Rodriguez answered: "There was work involved, I mean, there was [sic] problems at first." (Rodriguez Dep. at 34.) Further, Rodriguez explicitly testified that she received training on the new CUI software. (Rodriguez Dep. at 37.)

      Finally, RCO cites the fact that some of the modules for the CUDP Circa 2005 worked alongside the RCO system as "proof" of copying. (See Akin Dep. I at 138.) The fact that the CUDP Circa 2005 program modules worked alongside the RCO system is not probative of copying in any way—indeed, RCO's own director of sales and marketing testified that it is not unusual for a credit union to pay two software vendors for use of their respective softwares at the same time. (See Lieb Dep. at 35.)

      Because the above facts, when characterized accurately, do nothing to support RCO's case, the Court declines to list them as supporting facts for RCO's direct evidence claim.

[14] Akin testified that he never talked to employees about their experiences with the RCO software, as he considered "look[ing] at the existing state" to be too limiting. (Akin Dep. I at 85.) Other evidence indicates, however, that Akin asked some questions about CSE employees' interactions with the RCO system. (See Rodriguez Dep. at 29.) Thus, this Court will assume, for purposes of summary judgment, that Akin asked employees about their interaction with the RCO software.

programmers accessed the RCO interface. The evidence shows neither access to the literal program code nor copying of RCO's software, and—especially when juxtaposed with *Koons* and *Unison*—cannot reasonably be said to constitute probative direct evidence of copying. RCO's attempt to make a mountain out of a molehill notwithstanding, its "direct evidence" of copying constitutes a mere scintilla insufficient to create a triable issue of fact.

   Moreover, even if the Court were to indulge RCO and conclude that the above evidence creates a genuine issue of fact as to access and copying, RCO still has failed to show that Defendants copied protectable elements of RCO-1. RCO has never alleged that CUDP Circa 2005 is a carbon-copy of RCO-1—RCO only claims that CUDP Circa 2005 copied "key elements" of RCO-1 that CSE employees considered desirable. (*See, e.g.*, Doc. No. 100 at 22.) "Not all 'copying' is actionable, however; it is a constitutional requirement that a plaintiff bringing an infringement claim must prove 'copying of constituent elements of the work *that are original*." *Kohus*, 328 F.3d at 853 (emphasis in original). Despite RCO's burden to prove that the alleged "key elements" are original, RCO has provided no admissible evidence[15] detailing what these "key elements" are or that they constitute protectable original constituent elements protected under the Copyright Act. Thus, for the independent reason that RCO has not shown that the portions of RCO-1 that Defendants allegedly copied were protectable original constituent elements, RCO cannot recover under a direct evidence theory of copyright infringement.

   In short, the evidence RCO cites for its direct evidence claim is not probative and overly circumstantial, requiring many inferences upon inferences. And even if RCO had provided direct evidence that Defendants copied "key elements" of RCO-1, RCO has failed to show that those elements are protectable original elements. RCO has alleged no facts that would

---

[15] In its opposition memorandum, RCO attempted to introduce a declaration of Robert Reid as "fact testimony." (Doc. No. 125 Ex. B.) Since this Court has already determined that Reid's declaration is inadmissible (Doc. No. 149), it will not consider Reid's testimony.

permit a reasonable jury to find direct evidence of copying, and thus Defendants are entitled to judgment as a matter of law with respect to RCO's direct evidence of copying claim.

### 2. Indirect evidence of copying

Where there is not sufficient direct evidence of copying, a plaintiff may indirectly establish copying by showing (1) access to the original work, and (2) substantial similarity between the original work and the allegedly infringing work. *Kohus*, 328 F.3d at 854. RCO never mentioned its indirect evidence theory in its motion for partial summary judgment (*see* Doc. No. 100)—in fact, RCO first mentioned its indirect evidence theory in its opposition to Defendants' motion for summary judgment. (Doc. No. 125 at 11-12.) Then, for the first time, RCO moved for summary judgment with respect to its indirect evidence theory in its reply brief supporting its motion for partial summary judgment. (Doc. No. 133 at 9-11.) As RCO may not move for summary judgment on new theories in a reply brief, *see, e.g., Johnson v. SBC Advanced Solutions, Inc.*, 2004 WL 1151650, at *6 (N.D. Tex. May 21, 2004); *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1113 (N.D. Ill. 1997), the Court finds that RCO has not properly moved for summary judgment on its indirect evidence claim.

In any event, Defendants have moved for, and are entitled to, summary judgment on RCO's indirect evidence claim. Where there is no direct evidence of copying—as in this case for the reasons given in Section III.C.1, *supra*—a plaintiff may establish an inference of copying by showing (1) access to the copyrighted work, and (2) substantial similarity between the two works at issue. *Kohus*, 328 F.3d at 854. "In the context of computer programming, [a claim of indirect] legal copying requires rigorous analysis," *Auto Inspection Servs., Inc. v. Flint Auto Auction, Inc.*, 2006 WL 3500868, at *6 (E.D. Mich. Dec. 4, 2006), which the Sixth Circuit clearly laid out in *Kohus*. "[I]t is a constitutional requirement that a plaintiff bringing an

20

infringement claim must prove 'copying of constituent elements of the work *that are original*."
*Kohus*, 328 F.3d at 853 (emphasis in original). Thus, "the first step [in substantial similarity
analysis] is to filter out the unoriginal, unprotectible elements—elements that were not
independently created by the inventor, and that possess no minimal degree of creativity [. . .]."
*Id.* at 855. Unoriginal, unprotectible elements include "mere abstract ideas," "those elements
dictated by efficiency," and "elements that are 'dictated by external factors such as particular
business practices.'" *Id.* at 855-56. Given the complexity of credit union software, this first step,
like the intricate latch designs that were the subject of *Kohus*, will require expert testimony "to
establish what elements, if any, are necessary to the function" of the credit union software, and
are thus unprotectible. *Id.* at 856.

   "Once the unprotectible elements have been filtered out, the second step is to
determine whether the allegedly infringing work is substantially similar to the protectible
elements of the original." *Id.* at 856. This, in turn, requires determining the nature of the intended
audience for the product. *Id.* at 857. Generally a court should use the "ordinary observer" test. *Id.*
at 856. "In cases where the target audience possesses specialized expertise, however, the
specialist's perception of similarity may be much different from the lay observer's, and it is
appropriate in such cases to consider similarity from the specialist's perspective." *Id.* at 857.
Where the targeted audience is composed of specialists, "[e]xpert testimony will usually be
necessary to educate the trier of fact in those elements for which the specialist will look." *Id.*

   Against this backdrop, RCO's utter lack of "rigorous analysis" is evident. RCO
has not identified any elements of its program allegedly copied by Developer Defendants;
instead, RCO nondescriptly states that Developer Defendants copied "key elements" of RCO-1.
(Doc. No. 100 at 22.) RCO offers no evidence or argumentation that these "key elements" are

indeed original constituent elements protected under the Copyright Act. RCO's failure to carry its burden of proof has left this Court hamstrung and unable to engage in the necessary first step of analysis demanded under *Kohus*.

Moreover, even if this Court were able to divine *a priori* original protected elements from RCO's software, RCO has failed to offer any probative evidence of substantial similarities between the RCO-1 and CUDP Circa 2005 softwares. In order to satisfy the second step of *Kohus*, RCO must, at minimum, offer evidence that there are some substantial similarities between RCO-1 and CUDP Circa 2005 with respect to a protectable element of RCO's software. *See, e.g.*, *Lambing v. Hallmark Cards*, 166 F.3d 1214 (Table), 1998 WL 787098, at *1 (6th Cir. Oct. 29, 1998). These protectable elements may be found in the literal program code, internal structures controlling operation of the program, or the audiovisual displays. *Domenick*, 105 F.3d at 104; *Apple Computer*, 725 F.2d at 523; *Williams Electronics*, 685 F.2d at 874; *Strohon*, 564 F. Supp. at 746. There is no evidence in the record suggesting any similarities—let alone substantial similarities—between the literal program codes of the respective softwares of RCO and CUI. Indeed, neither party has retained an expert to compare the two source codes. Similarly, RCO has not pointed to any admissible evidence in the record suggesting any similarities between the structures or operations of the two softwares.[16] Finally, RCO has not claimed copying of protected audiovisual elements of RCO-1, and it has not pointed to any similarities between the

---

[16] RCO attempts to offer evidence of similar functioning of the programs through the Declaration of Robert Reid. For the reasons described in the previous footnote, that evidence is not admissible and will not be considered by this Court. Further, RCO has speculated that Craig Minch, an expert for Defendants, would provide evidence of similarities between the softwares in deposition. Minch is a non-testifying expert witness in the case, and thus it would be highly inappropriate for the Court to consider such speculation.

RCO also appears to suggest, though not directly, that an alleged "seamless" transition between the RCO-1 and CUDP Circa 2005 softwares at CSE constitutes indirect probative evidence of copying. (*See, e.g.*, Doc. No. 125 at 12.) As noted in footnote 13, *supra*, RCO's contention is simply incorrect. In any event, given that a claim of copying requires "rigorous analysis," *Auto Inspection*, 2006 WL 3500868, at *6, the testimony of a single CSE employee that the transition was "seamless," even if it actually existed, would constitute, at most, a mere scintilla of evidence insufficient to defeat a motion for summary judgment.

RCO-1 and CUDP Circa 2005 user interfaces. Indeed, as this Court recognized in a previous Order, it is undisputed that the two interfaces do not bear any visual resemblance, as RCO-1 uses a text-based interface whereas CUDP Circa 2005 uses a graphical user interface (GUI). (Doc. No. 150 at 4-5.)

In short, RCO's argumentation is woefully short of the "rigorous analysis" necessary to pursue a copyright claim. RCO has not made any effort to identify specific elements of its software that Developer Defendants allegedly copied, nor has RCO attempted to demonstrate that those specific elements are original, protectable elements under the first step of *Kohus*. Further, RCO has failed to offer any evidence of substantial similarity between the RCO-1 and CUDP Circa 2005 softwares with respect to any original, protectable elements, as required under the second step of *Kohus*.[17] Accordingly, Defendants are entitled to judgment as a matter of law with respect to RCO's indirect evidence of copying claim.

### 3. Conclusion

For the foregoing reasons, RCO has failed to offer sufficient probative evidence, direct or indirect, to establish a genuine issue of material fact as to whether Developer Defendants are liable for copyright infringement. Accordingly, RCO's motion for partial summary judgment on its copyright infringement claim is **DENIED**, and Developer Defendants' motion for the same is **GRANTED**.

### D. Misappropriation of trade secrets

The parties have filed cross-motions for summary judgment on RCO's misappropriation of trade secrets claim. Ohio law forbids a person from misappropriating the trade secrets of another. Under Ohio law, a trade secret

---

[17] Because RCO cannot establish substantial similarity, the Court need not consider whether Developer Defendants had access to the literal program code of RCO-1. *Lambing*, 1998 WL 787098, at *1.

means information [. . .] that satisfies both of the following:

> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.R.C. § 1333.61(D). Misappropriation, meanwhile, is defined as any of the following:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

> (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

> > (a) Used improper means to acquire knowledge of the trade secret; [or]

> > (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use [. . . .]

O.R.C. § 1333.61(B)(1), (2)(a)-(b). For purposes of the misappropriation statute, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." O.R.C. § 1333.61(A).

It is important to note that there is no evidence in the record showing that any CUI employee accessed the literal program code of RCO-1—indeed, the only evidence in the record indicates otherwise. (Akin Aff. ¶ 25 (no Developer Defendants or their agents accessed RCO's literal program code); Burkhardt Aff. ¶ 25 (same).) Thus, RCO cannot ground its misappropriation of trade secrets claim on any alleged misappropriation of the RCO-1 literal program code.[18] The evidence in the record does show, however, that two CUI employees used

---

[18] Since RCO has not shown any evidence indicating that Defendants accessed the literal program code, this Court need not address whether the code is a protectable trade secret under Ohio law.

CSE usernames and passwords to interact with the RCO-1 interface. (*See, e.g.*, Akin Dep. I at 65, 67; Akin Dep. II at 62; Lash Dep. at 16, 19.) Thus, RCO can show misappropriation of trade secrets if it shows: (1) that the RCO-1 interface is a trade secret within the meaning of Ohio law, and (2) that Developer Defendants misappropriated that trade secret. O.R.C. §§ 1333.61(B), (D).

As noted above, information is a trade secret only if it is the subject of reasonable efforts to maintain its secrecy. O.R.C. § 1333.61(D)(2). RCO's own President admitted that the RCO-1 interface is not a trade secret (Olmstead Dep. at 205), and the evidence in the record unequivocally shows that RCO made no reasonable efforts to maintain the secrecy of the RCO-1 interface. RCO's contract with CSE (as well as other credit unions) contained no confidentiality provisions that prevented third parties from viewing the interface. (Data Processing Contract.) Indeed, the Agreement expressly contemplated that CSE would use a personal computer support firm to assist with terminal emulation software (Data Processing Contract at 3), which RCO admitted would require third parties—including potential competitors of RCO—to view the interface.[19] (Olmstead Dep. at 205 (acknowledging that terminal emulator support firm would "have to look at what [the program] puts on the screens at least").) Thus, the evidence in the record unequivocally shows that the RCO-1 interface is not a trade secret under Ohio law.[20]

---

[19] RCO states that Burkhardt testified he did not need to access the RCO software in order to perform technical support services for CSE. (Doc. No. 133 at 5.) As is typical of many of RCO's claims in its summary judgment practice, this statement is misleading and distorts Burkhardt's testimony. In his deposition, Burkhardt testified that he was never issued a username and password to access the interface because he had access to the RCO-1 interface as readily as any other application on the CSE terminals. (Burkhardt Dep. at 110-11.) Thus, CUI did, in fact, have to access the RCO-1 interface in order to provide technical support services to CSE.

[20] RCO suggests that this Court held in a previous Order (Doc. No. 34) that the CUDP Circa 2005 software was a trade secret, and thus this Court must similarly hold that RCO-1 is a trade secret. As a preliminary matter, this argument is logically flawed—even if CUI's interface is a trade secret, this does not necessitate a finding that RCO's interface is also a trade secret. Whether information is a trade secret depends on the factual circumstances of the case, and here the undisputed facts clearly show that the RCO-1 interface is not a trade secret.

Furthermore, RCO's characterization of this Court's previous Order is simply wrong. This Court's previous Order dealt with a motion to compel production of the CUDP Circa 2005 software. (Doc. No. 34.) CUI argued that RCO employees could not have unfettered access to the software because that would allow them to access a CUI trade secret. (Doc. No. 34 at 10.) RCO did not challenge CUI's assertion that CUDP Circa 2005 was a trade secret, and thus this Court determined that CUI's software a trade secret in its resolution of the discovery

Furthermore, even if the interface was a trade secret, RCO has failed to offer any evidence that CUI employees engaged in "improper means" to access it under Ohio law. O.R.C. § 1333.61(B). RCO has never suggested that CUI engaged in bribery or espionage, nor alleged that any Developer Defendant made a misrepresentation to RCO in order to induce RCO it to provide a username and password to access the interface. CUI could not have induced a breach of duty to maintain secrecy of the RCO interface, as CUI had no contact with RCO employees and CSE was under no contractual duty to maintain secrecy of the RCO interface. (*See* Data Processing Contract.) RCO also cannot allege a theft of the information contained on the interface, as this Court has already rejected RCO's copyright infringement claim. *See* Section III.C, *supra*. Simply put, there is no evidence in the record showing that Defendants engaged in any "improper means" to misappropriate any alleged trade secrets of RCO, and for this independent reason Developer Defendants are entitled to judgment as a matter of law.

As RCO has failed to offer any probative evidence that Developer Defendants accessed a trade secret or engaged in any improper means to access information, there is no genuine issue of material fact as to whether Developer Defendants are liable for misappropriation of trade secrets. Accordingly, RCO's motion for partial summary judgment on its claim of misappropriation of trade secrets is **DENIED**, and Developer Defendants' motion for the same is **GRANTED**.

**E. Tortious interference with contractual and business relationships**

Developer Defendants have moved for summary judgment on RCO's tortious interference with contractual and business relationships claims. Under Ohio law, one may recover under tortious interference with a contractual relationship upon showing (1) the existence

---

dispute. (Doc. No. 34 at 11 & n.5.) The Court's Order was based solely upon RCO's concession—at no point did the Court make factual findings or hold as a matter of law that CUDP Circa 2005 was a trade secret.

of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Kenty v. Transam. Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995).  To recover under tortious interference with a business relationship, meanwhile, a plaintiff must show (1) the existence of a business relationship, (2) the tortfeasor's knowledge of the business relationship, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 780 (Ohio Ct. App. 2002). While the claims are closely related, tortious interference with business relationships applies only where there is intentional interference with prospective contractual relations, not yet reduced to a contract. *Id.* at 780-81. Under both tortious interference claims, the plaintiff must show that the interference was improper. *Fred Siegel Co., LPA v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999).

From 2005 through the present, six credit unions that purchased RCO's services changed to the CUDP Circa 2005 software. (Kambeitz Dep. at 26; Lieb Dep. at 33-34.) RCO contends that this shows tortious interference of contractual and business relationships, but has not offered any probative evidence in support. In order to prove interference with contractual relationships, RCO must show that Defendants procured a breach of contract. *Kenty*, 650 N.E.2d at 866. RCO's own officers admitted, however, that none of its prior customers breached their contracts with RCO. (Lieb Dep. at 33-34; Kambeitz Dep. at 95.)

Further, RCO has failed to offer any probative evidence tending to show that a prospective business relationship existed between RCO and its former customers. Thomas Lieb, RCO's director of sales and marketing, could not state whether RCO enjoyed any special position of trust or confidence with its former customers. (Lieb Dep. at 96-97.) Even more

27

compelling, Stephen Kambeitz, RCO's executive vice president, testified that he did not understand Developer Defendants to have interfered with RCO's business prospecting, and had no knowledge of any intentional interference with such prospecting. (Kambeitz Dep. at 34.) RCO has offered no evidence indicating otherwise. Thus, by the admission of RCO's own agents, there is no genuine issue of material fact as to whether Developer Defendants procured any breaches or terminations of business expectations or relationships.

As a final point, even if RCO could establish the elements of a tortious interference claim, there is no basis to infer that any interference with RCO's contractual or business relations was improper. Accordingly, RCO cannot recover under tortious interference. *Fred Siegel*, 707 N.E.2d at 858.

For the foregoing reasons, Developer Defendants' motion for summary judgment on RCO's tortious interference with business and contractual relationships is **GRANTED**.

### F. Unjust enrichment

Developer Defendants have moved for summary judgment on RCO's unjust enrichment claim. The elements of unjust enrichment are: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984). RCO alleges that Developer Defendants "benefited from more than two years of free and unfettered use of [RCO's] software package to further their development efforts." (Doc. No. 125 at 18.) There are two problems with this argument. First, RCO has characterized its unjust enrichment claim as arising from the Developer Defendants' alleged wrongful access of the RCO-1 software. Under this characterization, however, RCO's unjust enrichment claim is preempted by the Ohio Trade

28

Secrets Act. O.R.C. § 1333.67(A); *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999).

Second, even placing preemption aside, the undisputed evidence shows that RCO cannot show two of the three elements of an unjust enrichment claim. RCO did not confer any benefit upon any of the Developer Defendants; presuming any benefit existed, it was conferred by CSE, who provided two CUI employees with teller-level usernames and passwords to access the user interface. Further, presuming that a benefit was actually conferred upon Developer Defendants, there is no indication in the record that it would be unjust to allow them to retain that benefit. The Agreement between RCO and CSE did not restrict to whom CSE could issue usernames and passwords. (*See* Data Processing Agreement; Radcliff Dep. of 7/28/2008, at 94.) As CSE was free to issue the usernames and passwords as it did, it would hardly be unjust to allow Developer Defendants to retain the "benefit" of looking at the RCO-1 interface. Moreover, as noted in Section III.D, *supra*, RCO assumed, without objection, that CUI would view the RCO-1 interface in order to provide technical support services for CSE. RCO has never explained why it would be acceptable for Developer Defendants to view the RCO-1 interface during their nearly five years of providing technical support services, but that viewing the exact same interface through properly-issued usernames and passwords is so grossly unjust as to be actionable.

Since RCO's unjust enrichment claim is both preempted and unsupported, Defendants' motion for summary judgment must be **GRANTED**.

**IV. CONCLUSION**

For the foregoing reasons, the motion of RCO for partial summary judgment (Doc. No. 100) is **DENIED** and the motion of Defendants for summary judgment (Doc. No. 101) is **GRANTED**. All claims by RCO against Defendants are hereby **DISMISSED**.

**IT IS SO ORDERED**.


Dated: March 27, 2009                                    _____

                                            **HONORABLE SARA LIOI**

                                            **UNITED STATES DISTRICT JUDGE**